UNITED STATES of America, Plaintiff-Appellee,

v.

FIFTY–THREE (53) ECLECTUS PARROTS, Defendants

and

George E. Allen, Claimant-Appellant.

No. 80–4604.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 10, 1982.

Decided Aug. 31, 1982.

Robert Glenn White, Glad, White & Ferguson, San Francisco, Cal., for claimant-appellant.

Wells D. Burgess, Maryann Walsh, Washington, D.C., for plaintiff-appellee.

Before DUNIWAY, KENNEDY and CANBY, Circuit Judges.

CANBY, Circuit Judge.

Allen appeals from a summary judgment in favor of the government, ordering the forfeiture of 56 eclectus parrots. We affirm.

Appellant Allen raises and trades birds as an avocation. On his behalf, an importer bought eclectus parrots from a bird dealer in Singapore and imported them into the United States. The birds originated in Indonesia, which has prohibited the export of eclectus parrots, with special exceptions not applicable here, since 1972. The parrots arrived in the United States without any documentation showing their legal acquisition or export from Indonesia. Importation of protected wild birds without such accompanying documentation is proscribed by 19 U.S.C. § 1527 (1976).[1] The government therefore instituted this in rem forfeiture action under 19 U.S.C. § 1527(b).

---

1. 19 U.S.C. § 1527 (1976) was enacted as part of the Tariff Act of 1930, § 527, 46 Stat. 590, 741 (1930). In pertinent part, it provides as follows:

The facts surrounding the importation of the birds are essentially undisputed. Appellant's importer knew that the eclectus parrots originated in Indonesia, not Singapore. He did not know, however, that Indonesia restricted their export, or that these particular parrots had been exported illegally. Before bringing the parrots into this country the importer had asked United States Customs agents whether importing Indonesian eclectus parrots was against United States law, but had received no definitive answer.

Appellant raises two issues:

(1) Whether forfeiture of wild birds under § 1527(b) is proper in the absence of culpable disregard of foreign wildlife laws by the owner; and

(2) Whether eclectus parrots are "wild" within the meaning of 19 U.S.C. § 1527.

(a) Importation prohibited
If the laws or regulations of any country, dependency, province, or other subdivision of government restrict the taking, killing, possession, or exportation to the United States, of any wild mammal or bird, alive or dead, or restrict the exportation to the United States of any part or product of any wild mammal or bird, whether raw or manufactured, no such mammal or bird, or part or product thereof, shall, after the expiration of ninety days after June 17, 1930, be imported into the United States from such country, dependency, province, or other subdivision of government, directly or indirectly, unless accompanied by a certification of the United States consul, for the consular district in which is located the port or place from which such mammal or bird, or part or product thereof, was exported from such country, dependency, province, or other subdivision of government, that such mammal or bird, or part or product thereof, has not been acquired or exported in violation of the laws or regulations of such country, dependency, province, or other subdivision of government.
(b) Forfeiture
Any mammal or bird, alive or dead, or any part thereof, whether raw or manufactured, imported into the United States in violation of the provisions of the preceding subdivision shall be subject to seizure and forfeiture under the customs laws. Any such article so forfeited may, in the discretion of the Secretary of the Treasury and under such regulations as he may prescribe, be placed with the departments or bureaus of the Federal or

## I.

Section 1527(b) provides: "Any mammal or bird . . . imported into the United States in violation of the provisions of the preceding subdivision [§ 1527(a)] *shall* be subject to seizure and forfeiture under the customs laws." (emphasis added). Appellant argues that this subsection authorizes forfeiture only where the government shows the owner's culpable disregard of foreign wildlife laws. Although this contention has apparently never before been raised in the context of § 1527, the defense of non-culpability has frequently been rejected in forfeiture proceedings under other statutes.[2] We conclude that nothing in the legislative history of § 1527 supports appellant's argument and that the plain words and purpose of the statute militate against such an interpretation.[3]

■ Section 1527(b), as quoted above, is unequivocal and mandatory on its face; it

State Governments, or with societies or museums, for exhibition or scientific or educational purposes, or destroyed, or (except in the case of heads or horns of wild mammals) sold in the manner provided by law.

\* \* \* \* \* \*

2. *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 688–90, 94 S.Ct. 2080, 2094–95, 40 L.Ed.2d 452 (1974); *United States v. Six Thousand Seven Hundred Dollars ($6,700.00) in United States Currency,* 615 F.2d 1 (1st Cir. 1980); *United States v. One 1975 Pontiac Le Mans,* 621 F.2d 444, 447 (1st Cir. 1980); *United States v. One 1975 Ford Pickup,* 558 F.2d 755, 756–57 (5th Cir. 1977) (per curiam); *United States v. One 1967 Cadillac Coupe Eldorado,* 415 F.2d 647, 648 (9th Cir. 1969); *United States v. Bride,* 308 F.2d 470, 474 (9th Cir. 1962).

3. In *Jen Dao Chen v. United States,* 385 F.2d 939, 942 (9th Cir. 1967), this court interpreted 19 U.S.C. § 1592 as not permitting the forfeiture of an innocent owner's property. However, § 1592 contained language from which a requirement of intent to defraud the government could be drawn. Moreover, in *Chen* the person who allegedly made the false declaration in violation of § 1592 was a trespasser with respect to the property he falsely declared. In *United States v. Wagner,* 434 F.2d 627, 628–29 (9th Cir. 1970), we limited the *Chen* case based upon these two factors. Since the language of § 1527 does not suggest the culpability of the owner is relevant, and since the importers who imported the parrots were not trespassers with respect to them, *Chen* is inapposite.

prescribes forfeiture without regard to the presence or absence of culpability on the part of the owner of birds illegally imported. This fact alone is probably sufficient answer to Appellant's primary argument. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 n.29, 98 S.Ct. 2279, 2296 n.29, 57 L.Ed.2d 117 (1978). In any event, the purpose of the statute supports a literal interpretation of its language. Section 1527 is manifestly aimed at protecting endangered species of wild animals and birds, and at cooperating with other nations that pursue that goal.[4] The primary means chosen by Congress to achieve these aims was a limitation of importation, since a thriving import market in the United States could unquestionably constitute a significant threat to the continued existence and propagation of endangered species in the wild. To permit an importer to retain improperly taken birds on the ground of non-culpability would lend support to the commercial traffic in such birds, as the facts of this case demonstrate. Rather than reading into § 1527(b) a defense that would partially undermine its purpose, we adhere to the literal interpretation of the statute that places upon the owner the affirmative burden of insuring, by the appropriate documentation, that foreign wildlife laws have not been violated.

By its terms, section 1527 applies to both direct and indirect importations of wild birds and mammals from countries restricting their taking or export. We interpret the statute to require proper documentation from the animal's country of origin, whether or not the United States importer was involved in the initial export from that country. It is not unreasonable to require those who import wild birds and mammals to ascertain their origin. The conservation purpose of the statute could be undermined

significantly by permitting such importers to avoid the application of the statute by trading through intermediary countries. In the present case, although Appellant dealt only with a Singapore exporter, Appellant knew that the birds originated in Indonesia.

The scant legislative history of the statute does not alter our conclusion. Appellant argues that Congress demonstrated an intent to require culpability in the following statement in a House Report: "[W]e should not countenance disregard of the laws of [foreign] countries by permitting importation of birds and mammals taken or exported in violation of [foreign laws for the protection of wild birds and mammals]." H.R.Rep.No.7, 71st Cong., 1st Sess. 182 (1929), *reprinted in* Tariff Bill of 1929, Comparative Print of the Tariff Act of 1922 with H.R.2667, H.R.Doc.No.15, at 357 (1929). We cannot draw from this general statement the conclusion urged by Appellant; the "disregard" Congress wished to discourage is not stated to be only that of the importing owner. The conclusion that the legislative history does suggest is that neither House expressly considered the narrow question of owner culpability.[5]

■ Appellant also argues that the United States Customs Service must publish any foreign wildlife protection laws which serve as the predicate for requiring documentation under § 1527. First he contends that we should interpret the statute itself to require publication because Customs adopted a regulation, contemporaneously with the enactment of § 1527, that required publication. Appellant refers to the last sentence of the first regulation issued under § 1527 which provided:

(a) No wild mammal or bird, or part or product thereof, shall be released from customs custody, under bond or otherwise, if the collector has knowledge of a

---

4. *See* H.R.Rep.No.7, 71st Cong., 1st Sess. 181–82 (1929), *reprinted in* Tariff Bill of 1929, Comparative Print of the Tariff Act of 1922 with H.R.2667, H.R.Doc.No.15, at 357 (1929).

5. The only objection to the proposed § 1527 was the contention that enforcing the internal policies of foreign countries by such a drastic statutory provision was "beyond the proper

purpose of the [tariff] bill", S.Rep.No.37, 71st Cong., 1st Sess. 76 (1929), *reprinted in* 71 Cong.Rec.3378 at 3399. The Senate, however, receded from its attempt to eliminate § 1527 and agreed to restoration of the section, 72 Cong.Rec.10635 (1930). Section 1527 was enacted as proposed by the House.

foreign law or regulation that brings it within the purview of subdivision (2) of section 527 [19 U.S.C. § 1527], unless accompanied by the required consular certificate or entitled to entry under the provisions of subdivision (c) of such section.

(b) When in doubt as to the admissibility under such section of any importation, the collector should refer the case to the bureau for instructions. *Information with respect to the laws or regulations of foreign governments restricting the taking, killing, possession, or exportation to the United States of wild mammals or birds or parts or products thereof will be published in the Treasury Decisions.*

T.D. 44412, 58 Treas.Dec. 724–25 (1930). [Emphasis added.]

Even if we were to view this regulation as an interpretation of § 1527, requiring publication of foreign wildlife laws, that "interpretation" was abandoned long ago. Since 1939, the regulations have not contained any statement that foreign laws will be published, and since 1952, Customs has published no new § 1527 notices. Moreover, we do not believe that the original regulation or the § 1527 notices published pursuant to it interpreted § 1527 to require publication of foreign wildlife laws. Trea-

sury Decision 44412, *supra*, recited the full text of § 1527 as a preface to the regulation. Nothing in the statute suggests that publication is required. The regulation which followed focused on the collector's knowledge of foreign laws as it pertained to his enforcement duties. Publication of those laws in the Treasury Decisions was one source of information for him, but it is not at all clear that this was to be his only source. In fact, "when in doubt" the collector was to "refer the case to the bureau for instructions." We therefore cannot read the regulation as a contemporaneous construction of § 1527 requiring publication of foreign laws as a prerequisite to enforcement.

■ We also reject Appellant's contention that, even if the statute does not require publication of foreign laws, the current rules of Customs have imposed such a duty. We recognize that an agency can create a duty to the public which no statute has expressly created,[6] but we cannot agree that Customs has done so here. At the time Appellant imported the parrots, the only applicable regulation in the Code of Federal Regulations was 19 C.F.R. § 12.28,[7] which does not require or even mention publication of foreign wildlife laws. Therefore, the only possible source for an existing

---

**6.** *See Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974); *United States v. Nixon*, 418 U.S. 683, 694–96, 94 S.Ct. 3090, 3100–01, 41 L.Ed.2d 1039 (1974) (legislative rules); *cf. Ruanswang v. Immigration and Naturalization Service*, 591 F.2d 39, 44–46 (9th Cir. 1978) (I.N.S. regulations, which established standards, bind agency; adjudicatory rulemaking was ineffective to create additional standards absent adequate notice). *But cf. Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (Social Security Act claims manual is handbook for internal use; agents' failure to follow procedure prescribed by manual does not provide the basis for estoppel against the government); *Lewin v. Schweiker*, 654 F.2d 631, 633 (9th Cir. 1981) (Social Security Administration's claims manual is an internal agency guide, without the force or effect of a statute or regulation); *Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1043 (Ct.Cl.1978) (taxpayer relies on revenue rulings and informal I.R.S. publications at his own peril). *See generally,* Davis, Administrative Law Treatise, § 7:21 (1979).

**7.** 19 C.F.R. § 12.28 (1979) provided as follows:
§ 12.28 Importation of wild mammals and birds in violation of foreign law.
(a) No imported wild mammal or bird, or part or product thereof, shall be released from Customs custody, except as permitted under § 12.26(i) relating to an in-bond movement to a port designated for wildlife entry, if the district director of Customs has knowledge of a foreign law or regulation obliging enforcement of section 527(a), Tariff Act of 1930 (19 U.S.C. § 1527(a)), unless the importation is an excepted transaction entitled to entry under the provisions of section 527(a) of the Tariff Act or, in connection with the entry, there is presented documentation in either manner specified in 50 CFR § 17.-4(c)(1) or (2) required for import transactions subject to foreign laws or regulations regarding taking, transportation, or sale of wildlife including wild mammals and birds or parts or products thereof (see § 12.26).

agency publication requirement is § 12.28 of the U. S. Customs Manual (1976 ed.), which states that information concerning foreign wildlife laws or regulations "will be published" in the Customs Bulletin. But the Manual is an internal agency guide for Customs offices; it was not intended for the use of the general public. It specifically refers the public to the Code of Federal Regulations for guidance concerning proper observance of the customs and navigations laws.[8] Recently, this Circuit stated: " '[N]ot all agency policy pronouncements which find their way to the public can be considered regulations enforceable in federal court.' " *Rank v. Nimmo*, 677 F.2d 692, 698 (9th Cir. 1982), *quoting Chasse v. Chasen*, 595 F.2d 59, 62 (1st Cir. 1979). To have the " 'force and effect of law,' " enforceable against an agency in federal court, the agency pronouncement must "(1) prescribe substantive rules—*not* interpretive rules, general statements of policy or rules of agency organization, procedure or practice —and, (2) conform to certain procedural requirements." *Id.* at 698 (emphasis in original). To satisfy the first requirement the rule must be legislative in nature, affecting individual rights and obligations; to satisfy the second, it must have been promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress. *Id.* Clearly, this internal procedure for alerting Customs officers to possible infringements of 19 U.S.C. § 1527 was not intended as a substantive rule, and was not entitled to the force and effect of law against the government. *See id.* at 698–99 (holding that VA Lenders' Handbook and VA Circulars do not have the force and effect of the law.)[9]

Appellant cites *Morton v. Ruiz*, 415 U.S. 199, 233–35, 94 S.Ct. 1055, 1073–74, 39 L.Ed.2d 270 (1974), for the proposition that an agency is bound to follow a publication requirement set forth in its manual even though the manual is for internal use only. We do not view *Ruiz* as comparable to the present case. In *Ruiz*, the Bureau of Indian Affairs had failed to publish Indian welfare eligibility requirements which restricted benefits authorized by Congress. *Id.* at 230, 94 S.Ct. at 1072. Assuming *arguendo* that the Secretary rationally could have so limited the welfare benefits, *id.* at 231, 94 S.Ct. at 1072, the Court concluded that to do so, the Secretary must treat the restrictions as legislative-type rules, *id.* at 236, 94 S.Ct. at 1075, and publish them accordingly, *id.* The present case differs markedly from *Ruiz*. The "publication requirement" contained in the Customs Manual is not a rule eliminating, narrowing or redefining Appellant's statutory rights. It is merely a method for providing customs agents with information pertinent to their law enforcement duties.

Furthermore, we reject Appellant's contention that, as an "innocent" owner-claimant, he is protected from the sanction of forfeiture by the final paragraphs of *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 688–90, 94 S.Ct. 2080, 2094–95, 40 L.Ed.2d 452 (1974). In that case, the Supreme Court was confronted with a yacht owner's constitutional challenge to a Puerto Rican forfeiture statute. The yacht had been forfeited because a lessee had used it to transport marijuana. The yacht's owner was neither aware of nor involved in the transportation of the marijuana. In spite of that fact, the Supreme Court held that forfeiture did not violate the owner's Fifth Amendment rights. *Id.* at 680–690, 94 S.Ct. at 2090–95. The owner had "voluntarily

---

**8.** The Order of Publication of June 1, 1954, included in the Customs Manual, describes the manual's regulations as follows:

The regulations contained herein are effective only against persons in their capacity as officers, agents, or employees of the Customs Service, and do not prescribe procedures necessary for the public to know or follow in dealing with the Customs Service. Regulations which are of interest to the public as a

guide to proper observance of the customs and navigation laws are contained in the volume "Code of Federal Regulations, Title 19, Chapter 1," also known as the "Customs Regulations."

**9.** As was the case in *Rank v. Nimmo*, 677 F.2d at 698 n.10, nothing in the record here suggests that Appellant relied to his detriment on § 12.28 of the Customs Manual.

entrusted" the yacht to the lessee. Appellant here, however, relies on the Court's closing suggestion in *Calero-Toledo* that another owner's challenge might succeed if he could prove "not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; for in that circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive." *Id.* at 689–90, 94 S.Ct. at 2094–95. This language, however, referred to the rights of an owner who had not violated the terms of any statute. The *only* reason for the hypothetical forfeiture was that others had used the property for illegal purposes. In contrast, Appellant in this case was directly involved in the violation of a United States customs law and forfeiture serves the purposes of that law. No forfeiture would have been authorized had Appellant or his importer presented proper documentation for the birds. By failing to do so Appellant violated 19 U.S.C. § 1527 and precipitated the forfeiture. The birds were not imported against Appellant's will and Appellant has not alleged any attempt to secure the required documentation, or even any founded belief that the documentation could have been secured. Appellant therefore cannot avail himself of the limited exception to forfeiture suggested by *Calero-Toledo* for the benefit of wholly innocent owners who have taken all reasonable precautions to prevent the proscribed activity.

## II.

Finally, Appellant contends that the eclectus parrots are not "wild" within the meaning of § 1527, since breeders have had some limited success in breeding the birds in captivity, and some of the birds show signs of having been so bred. The government maintains that § 1527 applies to any foreign bird whose species is normally found in a wild state if the country of origin protects the species. We adopt the government's definition of "wild." A contrary interpretation would create obvious enforcement difficulties. The inquiry must

be directed to the species. *Cf.* 18 U.S.C. § 42(a)(2) (Lacey Act defines "wild" to mean creatures that "normally are found in a wild state"). Since Appellant did not present any evidence that the species is no longer normally found in a wild state, there was no genuine issue of material fact and the United States was entitled to summary judgment as a matter of law. Summary judgment was therefore proper. *See* Fed. R.Civ.P. 56(a).

AFFIRMED.